**In re Christopher L. LUX, M.D. and Dennis O'Banion, M.D.**

No. 06–01–00082–CV.

Court of Appeals of Texas, Texarkana.

Submitted June 26, 2001.

Decided July 11, 2001.

Concurring Opinion July 20, 2001.

Ken W. Good, Don W. Kent, Buchanan Kent, PC, Tyler, for relator Christopher Lux, M.D.

Jeffery C. Lewis, Victor Hlavinka, Atchley, Russell, Waldrop & Hlavinka, Texarkana, for relator Dennis O'Banion, M.D.

Dale D. Williams, Fadra L. Day, Williams, Squires & Wren, LLP, Waco, for real parties in interest Jerry Kirkpatrick, Ind. & as Administrator.

John B. Greer III, Patton, Haltrom, Roberts, Texarkana, for other parties, Hasmarck of TIS Inc.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice ROSS.

In this mandamus proceeding, Relators, Christopher Lux, M.D. and Dennis O'Banion, M.D., defendants in a medical malpractice suit, ask us to order the trial court to permit them to conduct discovery of privileged information from the plaintiffs, the real parties in interest, and their counsel. The discovery sought is alleged to be protected by the attorney-client and work product privileges and has to do with information concerning an unequal monetary division made in a settlement between another defendant (a nursing home) and the plaintiffs. The settlement provided a $995,000.00 recovery for the husband of the decedent in the case, $100,000.00 each for her two children and for her mother, and $5,000.00 for the estate of the decedent.

The plaintiffs sought protection from such discovery, and after a hearing at which no evidence was presented, the trial court issued an order limiting Relators' discovery to "matters that do not violate the attorney-client privilege or work product privilege." Relators maintain that the fraud exception to these privileges entitles them to pierce them and discover the mental processes or discussions that led to the

settlement, and to obtain answers to their questions about receiving, or agreements to provide or receive, additional benefits from the settlement proceeds. Relators contend that without this discovery, they cannot meet the requirements of the recent Texas Supreme Court case of *Utts v. Short*, No. 99–0366, 2000 WL 1784846, at *4 (Tex. Dec.7, 2000) (pending on rehearing), explaining the application of settlement credits.

*Utts* was also a medical malpractice case with multiple plaintiffs—all family members. All plaintiffs settled with one defendant, but they allocated the money so that the entire $200,000.00 went to one plaintiff, Walker, with $150,000.00 being delivered to plaintiffs' counsel and $50,000.00 directly to Walker. Walker then asked plaintiffs' counsel to distribute $10,000.00 to each family member. Walker nonsuited defendant Utts and the settling defendant, and the other plaintiffs also nonsuited the settling defendant (for $10.00 each). The case then went to trial between the remaining plaintiffs and Utts. Plaintiffs won $436,000.00 in damages, and Utts filed an election for a dollar-for-dollar settlement credit, including the Walker settlement. The trial court instead rendered judgment on the verdict, reduced by $50.00, the amount paid by the settling defendant to the remaining plaintiffs.

The Texas Supreme Court affirmed, holding that while a distribution of settlement amounts could be an impermissible sham transaction, *the defendant had the burden to prove indirect entitlement to the credit* on the ground that the settlement was a sham. The court found Utts had not met his burden of demonstrating sham and agreed that he was not entitled to a credit for the Walker settlement.

Relators contend in this case that the trial court abused its discretion by refusing to permit the complete discovery sought because they were entitled to explore the question of whether the settlement was a sham transaction, structured to keep them from claiming a credit for money paid in settlement by the nursing home. Relators presented no evidence to the trial court, but contend they provided sufficient information through their allegations and the representations of plaintiffs' counsel to require the trial court to conclude that the transaction may have been a sham, and thus justify discovery that would go behind the privileges.

We have reviewed the record provided to this Court, as well as the representations made by counsel in this mandamus proceeding about the information presented to the trial court before it made its ruling. It is clear from the pleadings that the trial court was aware that an unequal division of the settlement proceeds was to occur as described above. It is also clear that the court was aware the defendants believed the plaintiffs had structured the settlement in order to take advantage of *Utts* and sought discovery to find out if the intent behind that act was to deprive them of their lawful settlement credit, and if some undisclosed division of the settlement money was contemplated.

Mandamus is an extraordinary remedy that will issue only to correct a clear abuse of discretion or, in the absence of another statutory remedy, when the trial court fails to observe a mandatory statutory provision conferring a right or forbidding a particular action. *Abor v. Black*, 695 S.W.2d 564, 567 (Tex.1985). Mandamus may issue even on questions of first impression if, as a matter of law, the trial court erred in its analysis and reached an erroneous legal conclusion. *Huie v. De-Shazo*, 922 S.W.2d 920 (Tex.1996).

Relators maintain, in effect, that they are entitled to discover privileged

matters without meeting an initial level of proof because they can only obtain the proof necessary to obtain such discovery by questioning the parties and their counsel to determine the reasons for the division of the settlement proceeds. This flies counter to the requirements set out by the rules governing discovery of privileged matters. The fraud exception is found in TEX.R.EVID. 503(d)(1), which provides that communications made between counsel and client in the furtherance of a crime or a fraud are discoverable. It provides that there is no privilege under the rule if "the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." Similarly, attorney work product (including core work product), as defined by TEX.R.CIV.P. 192.5(a), is discoverable if it falls within the exception set out by TEX.R.EVID. 503(d). However, in order to obtain such materials, the party asserting the exception must initially provide evidence to make a prima facie showing of the contemplated fraud. *Granada Corp. v. First Court of Appeals*, 844 S.W.2d 223, 227 (Tex.1992).

The real parties in interest contend that under *Utts*, the parties have the right to make such a disparate settlement and that it cannot be a sham unless some portion of the money was then transferred to the other parties through a hidden gift or some other undisclosed benefit or agreement.

In *Utts* the proof showed that the settling party immediately made a "gift" of money to the other plaintiffs and that there was no direct evidence that the payments were not a good-faith gift.

To show that the apportionment of the settlement was a sham, a defendant is required to show more. Since we presume the Texas Supreme Court did not mean to set an unreachable bar, then the evidence which it found to be necessary must be available from some source.

█ In this case, Relators rely heavily on the disparate settlement allocation and the alteration of the structure for payment of attorneys' fees by the plaintiffs. However, in *Utts* the Texas Supreme Court found that a plaintiff may take a significant (if not the entire) settlement amount, nonsuit against the remaining defendants, and the award taken is not credited against the remaining parties.[1] Thus, the mere inequitable allocation of settlement awards cannot represent evidence of a sham. In this case, the allocation of unequal amounts was known and revealed to all parties. It was not a sham in itself. Suits involving multiple plaintiffs, particularly when all the plaintiffs are family members, can have many reasons for determining to split a settlement in unequal amounts.

The plaintiffs originally determined that Jerry Kirkpatrick, husband of the deceased, would pay all of the attorneys' fees and costs. The plaintiffs then changed to a payment structure where each plaintiff would pay his or her respective attorneys' fees after Relators alleged that the original arrangement would deprive them of settlement credit. Although Relators asserted that this change was evidence of a sham, they failed to show that the original arrangement would have deprived them of a settlement credit, or that the change was not as plaintiffs contend: to avoid Relators' credit *not* being properly recognized.

Without evidence of a sham, Relators present nothing more than a mere allegation. To allow Relators to violate attorney-client and work product privileges on

---

1. Relators characterize this practice as "Utts"ing the defendants.

such a basis would allow for the dissolution of such privileges in any case where plaintiffs divide a settlement unequally.

The trial court did allow Relators to conduct discovery into whether a sham existed. After discovery, no evidence of a sham was found. During the deposition of Jerry Kirkpatrick, who will receive $995,000.00 of the $1,300,000.00 settlement with the nursing home, the following testimony was given:

Q Have you had any discussions with either of your children in which you have told them that you would be willing to pay them money out of the proceeds you receive in the settlement?

A No.

Q Do you plan on having any such type of conversation with your children?

A No.

Q Do you plan on making any payments out of the proceeds of this settlement for the benefit of your children?

A No.

. . . .

Q Have you made any agreements with Ms. Williams [decedent's mother] to distribute money to her out of the funds you receive from the nursing home?

A No.

Q Do you intend to make any disbursements to Ms. Williams out of the funds you receive from the nursing home?

A No.

Q Have there been any discussions with Ms. Williams to make payments on her behalf out of the funds from the nursing home?

A No.

. . . .

Q Are you making arrangements, or are you planning to buy any type of annuities which would be to the benefit of your children?

A No.

Q And the same question with regard to Ms. Williams.

A No.

. . . .

Q Do you intend to make any arrangements that would benefit your children?

A No.

Q Do you intend to make any arrangements with that money which would benefit Ms. Williams?

A No.

Q Have you discussed with your children or Ms. Williams your ability to make gifts to them during the year?

A No.

Q Do you intend to make any gifts of money to them from the proceeds of the settlement?

A No.

. . . .

Q Do you have any documents, writings, memoranda or agreements between yourself and any of the plaintiffs regarding the decision to settle your claims against the nursing home?

A No.

Q Do you have any documents, writings, memoranda or agreements between plaintiffs and your attorneys regarding the decision to settle your claims with Hasmark of Texas [the nursing home]?

A No.

Q Do you have any documents, writings, memoranda or agreements between the plaintiffs and your law firm representing you in this case regarding the risks, benefits and structure of the settlement with the nursing home?

A No.

Q  Do you have any documents, writings, memoranda or agreements regarding any secondary distributions of the settlement funds received from the nursing home?

A  No.

Q  Do you have any documents, writings, memoranda or agreements regarding the purchase or planned purchase of any annuities with the settlement money you receive from the nursing home?

A  No.

Similar questions and responses were taken in the depositions of the other plaintiffs and their attorneys. The answers produce no evidence of a sham, while the questions demonstrate that testimony and other evidence which does not intrude on privilege can be procured. Relators inquired about the plans of the plaintiffs with regard to the settlement, and no evidence of any hidden distribution was produced. The questions posed by Relators go directly to the issue of a possible sham, and no indication of a possible sham was produced that moves beyond mere allegation. The subjective belief of Relators that a sham is being committed does not constitute valid evidence to violate fundamental privileges.

Relators have not met their burden of demonstrating sham.

The petition is denied.

GRANT, Justice, concurring.

I agree in the results of the majority opinion, but I disagree that this court should write an opinion on this point at this time because this opinion relies on *Utts v. Short, No. 99–0366, 2000 WL 1784846, at \*4 (Tex. Dec.7, 2000), which is presently pending on rehearing and is reset for submission on September 19, 2001.*

Creating a verb from the *Utts* case, counsel for the relators characterized the practice alleged in this case as "Utts"ing. At this point in time, there is much uncertainty as to what "Utts"ing may mean.

I am in hopes that the Texas Supreme Court will give guidance to the courts of this State that cannot be provided in this opinion. Counsel in the present case presented able arguments contesting what constitutes a sham settlement. One side took the position that if the figures of distribution in the prior settlement are intentionally proportioned for the purpose of thwarting the proper credit to be applied in the pending suits, this should be construed as a sham settlement. The other side took the position that a sham transaction occurred only if the settlement agreement was a sham because the actual distribution made, or agreed to be made, was in a manner different from the settlement agreement and the settlement agreement itself was a sham to disguise the actual distribution.

In addition to this, I believe the Supreme Court should develop an appropriate procedure in a bifurcated trial so that contentions of a sham transaction as to the prior settlement could be explored after the jury had made a determination of damage entitlement. If no damages were awarded, then a further proceeding would be unnecessary. If proper allegations were made that there had been a sham settlement which would affect the credits on the jury verdict, then the trial court should allow additional discovery limited to whether a sham transaction existed. If sufficient evidence was developed to create a fact issue on that matter, then the matter should be presented to the jury for further deliberations to determine if there was a sham transaction. I do not endorse the majority opinion except for the results, because I believe further guidance may be

forthcoming from the Supreme Court in the *Utts* case.