Petition for Writ of Mandamus Conditionally Granted in Part and Denied
in Part; Opinion filed May 15, 2007








 

Petition
for Writ of Mandamus Conditionally Granted in Part and Denied in Part; Opinion
filed May 15, 2007.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00930-CV

____________

 

IN RE GENERAL AGENTS INSURANCE 

COMPANY OF AMERICA, INC.,

Relator

 

 



 

ORIGINAL PROCEEDING

WRIT OF MANDAMUS

 



 

O P I N I
O N








In its
petition for writ of mandamus, relator, General Agents Insurance Company of
America, Inc. (AGainsco@), requests that we direct respondent, the Honorable
Elizabeth Ray, presiding judge of the 165th District Court, to vacate and set
aside her order compelling production of Gainsco=s insurance claims file related to a
lawsuit against Traxel Construction, Inc., one of Gainsco=s insureds.  Specifically, Gainsco
contends that the trial court erred in (1) ordering production of documents
relating to the underlying action against Traxel, (2) ordering production of
documents relating to the current coverage suit against Gainsco, and (3)
refusing to permit redaction of reserves information from produced documents. 
Granting relief in part, we conditionally grant the petition for writ of
mandamus.

I. 
Background 

Real
parties in interest, El Naggar Fine Arts Furniture, Inc. and Ahmed El Naggar
(collectively AEl Naggar@), contracted with Frederick Bell and, subsequently, his
corporation, Traxel, for the construction of a steel building and a concrete
slab.  Problems arose and, in 2001, El Naggar filed suit against Bell, Traxel,
and other parties, alleging defective construction.  Gainsco had previously
issued a $500,000 commercial general liability policy to Traxel, covering from
March 22, 2000 to March 22, 2001.  Gainsco retained attorney Glen Fahl as
Traxel=s defense counsel, assigned Sharon
Preen as claims adjuster, and established a claims file in connection with the
proceeding.  Gainsco also requested and received a coverage opinion regarding
the El Naggar lawsuit from another attorney, Brent Cooper.

The
first trial in the action ended in a mistrial.  Shortly before the second trial
was to begin, Gainsco and Traxel entered into a Abuy-back agreement,@ dated October 6, 2004.  Under the
terms of this agreement, Gainsco repurchased Traxel=s $500,000 policy for $50,000, and
Traxel released Gainsco from any and all claims or demands arising out of the
policy.  As further consideration, Traxel and Gainsco agreed that the terms
would remain confidential, Aexcept that counsel for Traxel may tell opposing counsel that
there is no insurance available.@  However, a handwritten and
initialed notation on the agreement provided that Traxel could Asupplement discovery in this pending
litigation by supplying this agreement.@  Shortly thereafter, Traxel produced
a copy of the agreement to El Naggar.  The lawsuit proceeded to a second trial,
which resulted in a $3.5 million judgment in El Naggar=s favor, dated August 8, 2005.








El
Naggar subsequently sued Gainsco (along with other of Traxel=s insurers, which are no longer
parties), alleging that the Gainsco-Traxel policy provided coverage for El
Naggar=s claims, Gainsco breached its
insurance contract with Traxel, and the buyback agreement violates public
policy.  El Naggar additionally asserted claims for fraudulent transfer, civil
conspiracy, DTPA violations, insurance code violations, breach of the duty of
good faith and fair dealing, and tortious interference with contract.  Some of
the claims are based on an assignment of rights Traxel granted to El Naggar, on
which, El Naggar claims the right to sue on its own behalf and as Traxel=s assignee.

In
discovery requests, El Naggar asked for materials contained in Gainsco=s claims handling file, pertaining to
both the underlying lawsuit against Traxel and the current coverage lawsuit
against Gainsco.  In response, Gainsco produced some documents, raised general
objections to the requests, and asserted the attorney-client and work product
privileges in relation to certain other materials.  El Naggar then filed
motions to compel production, arguing, inter alia, that (1) Traxel had waived
and released its attorney-client and work product privileges in relation to the
documents in Gainsco=s file (in its assignment of claims to El Naggar), and (2)
the documents were required to be produced under the crime/fraud exception to
the asserted privileges because Gainsco and Traxel had perpetrated a fraudulent
transfer by entering into the buyback agreement. Subsequently, Gainsco produced
a privilege log and tendered the disputed documents to the trial court for in
camera review.  In its briefing to this court and in its privilege log, Gainsco
grouped the documents into two main categories:  those pertaining to the
underlying litigation against Traxel and those pertaining to the current (or
coverage) suit against Gainsco.  Gainsco has also requested that certain
documents be redacted if produced because they contain information regarding
its reserves for both the underlying litigation and the current litigation.








The
trial court granted El Naggar=s motions to compel, and ordered Gainsco to produce its
entire claims file, without specifying the grounds on which it based its
ruling.  We will first address Gainsco=s assertions of privilege in the
underlying case and coverage case documents.  We will then address El Naggar=s argument that even if some
documents are covered by the privileges, the privileges should not apply due to
the crime/fraud exception.  Lastly, we will address Gainsco=s argument that reserves information
should be redacted from produced documents.

II. 
Standards of Review

Mandamus is an appropriate remedy
only when the record shows:  (1) the trial court clearly abused its discretion
or violated a duty imposed by law; and (2) no adequate remedy by appeal
exists.  In re Daisy Mfg. Co., 17 S.W.3d 654, 658 (Tex. 2000) (orig.
proceeding) (per curiam).  A trial court abuses its discretion in determining
the legal principles that control its ruling if the court clearly fails to
analyze or apply the law correctly.  Walker v. Packer, 827 S.W.2d 833,
839 (Tex. 1992) (orig. proceeding).  Remedy via appeal is generally considered
inadequate in the context of discovery disputes when (1) the appellate court
would not be able to cure the trial court=s error, (2) the ability of the party
seeking mandamus to present a viable claim or defense at trial is severely
compromised, or (3) the missing discovery could not be made a part of the
appellate record.  Id. at 843.  In the case of privileged documents that
are erroneously ordered to be produced, the resulting harmCof having the documents inspected,
examined, and reproducedCcannot be remedied by appeal.  Id.

The attorney-client privilege is
governed by Rule 503 of the Texas Rules of Evidence.  Tex. R. Evid. 503.  Under this rule, a Aclient has a privilege to refuse to
disclose and to prevent any other person from disclosing confidential
communications made for the purpose of facilitating the rendition of professional
legal services to the client.@  Id.  503(b)(1).  The privilege covers not only
direct communication between lawyer and client but also communications
involving the client=s representatives and the lawyer=s representatives, so long as they
were made for the purpose of facilitating legal services to the client.  Id. 
503(b)(1)(A), (D).

The work product privilege is
governed by Rule 192.5 of the Texas Rules of Civil Procedure.  Tex. R. Civ. P. 192.5.  It covers:








(1) material prepared or mental impressions developed
in anticipation of litigation or for trial by or for a party or a party=s representatives, including the party=s attorneys, consultants, sureties, indemnitors,
insurers, employees, or agents;  or

(2) a
communication made in anticipation of litigation or for trial between a party
and the party=s representatives or among a party=s representatives, including the
party=s attorneys, consultants, sureties,
indemnitors, insurers, employees, or agents.

Id. 192.5(a).

III.  Documents Pertaining to the
Underlying Litigation

As mentioned above, Gainsco has
identified two main categories of documents in its claims handling file:  those
pertaining to the underlying litigation and those pertaining to the current
suit.  In relation to the first category, the underlying litigation documents,
Gainsco argues that the trial court erred in compelling production because (1)
Gainsco has properly asserted attorney-client and work product privileges in
the documents as Traxel=s representative; (2) Gainsco has properly asserted its own
privileges in the documents; (3) Traxel=s attorney has a right to assert
privileges; and (4) the documents are not relevant to any issues in the
lawsuit.

A.  Assertion of Traxel=s Privileges

In its briefing to this court (and in
trial court filings), Gainsco has maintained that it must assert
attorney-client and work product privileges on Traxel=s behalf, in relation to the
underlying litigation documents, because as Traxel=s insurer, it was acting as Traxel=s representative in the conduct of
the underlying litigation.  Indeed, many of the documents in question are
drafted by, addressed to, or pertaining to communications with Glen Fahl, the
attorney whom Gainsco hired to represent Traxel in the underlying litigation.








In its motions to compel and
attendant briefing in the court below, El Naggar argued that Traxel=s assignment of claims to El Naggar
also resulted in waiver of Traxel=s right to assert any privileges
relative to the documents held by Gainsco.  Gainsco responded, in the court
below and in its petition, that Traxel did not effectively assign, waive, or
release its privileges by agreeing to the assignment because the assignment
does not contain express language to that effect, citing In re Cooper,
47 S.W.3d 206, 208-09 (Tex. App.CBeaumont 2001, orig. proceeding). 
After Gainsco filed its petition, however, El Naggar filed in the trial court
(with a copy to this court) a second assignment of rights signed by Traxel=s principle, Fred Bell.  This
document provides in full as follows:

 

ASSIGNMENT OF PRIVILEGES REGARDING GAINSCO 

IN THE UNDERLYING LITIGATION

Fred Bell, individually, and as sole shareholder,
officer and representative of Traxel Construction, Inc. (hereinafter
collectively referred to as ABell@) hereby grants, conveys, assigns and otherwise
transfers to El Naggar Fine Arts Furniture, Inc. and/or Ahmed El Naggar all
privileges, rights, and claims of privacy, including but not limited to
attorney/client communication privileges, relating to the following specific
issues only:

1.         Any communications regarding GAINSCO=s insurance policy pertaining to El Naggar=s claims filed in the underlying litigation styled
Ahmed El Naggar, et al v. Traxel Construction, Inc., which was litigated in
the 269th Judicial District Court;

2.         Any and all communications, deliberations
and/or exchanges pertaining to the GAINSCO buyback agreement of the insurance
policy pertaining to the underlying litigation, and 

3.         GAINSCO=s
claims handling and/or communications with Mr. Fahl regarding the duties to
indemnify and/or defend either Bell or Traxel in the above-referenced
litigation that was litigated in the 269th Judicial District Court.

This assignment is supplemental and in addition to the
previous assignment dated September 22, 2006.  It was the intent that the
previous September 22, 2006, assignment implicitly contain the assignments set
forth herein, and this assignment is simply a more express statement of the
previously assigned rights, privileges and interests intended to be conveyed
earlier.

This assignment is irrevocable and may not be
withdrawn for any purpose.

 








In response, Gainsco alleges that the
assignment (1) is unsworn, unauthenticated hearsay; (2) did not exist and thus
was not part of the record when the trial court made its ruling; and (3) may be
void as against public policy.  Regarding the first argument, El Naggar filed
the assignment attached to a Notice of Filing that was signed by El Naggar=s counsel and stated that the
assignment is what it purports to be.  Furthermore, El Naggar subsequently
filed a verification, signed by the same attorney, notarized, and purporting to
authenticate the copy of the assignment filed with this court.  Gainsco does
not cite any authority which requires an assignment of privilege or waiver of
privilege to be sworn.  See generally Tex.
R. Evid. 511 (providing for waiver of privilege by consent to
disclosure).

Regarding the second argument, the
assignment renders moot many of the issues raised in the petition.  We will not
issue the extraordinary writ of mandamus to protect privileges that have been
waived in the interim.  Cf. In re County of El Paso, 104 S.W.3d 741, 743
(Tex. App.CEl Paso 2003, orig. proceeding) (holding that discovery issues brought in
petition for mandamus were rendered moot when subsequent to filing of petition,
party withdrew its objections to discovery and the trial court vacated its
order); Fitzgerald v. Rogers, 818 S.W.2d 892, 895 (Tex. App.CTyler 1991, orig. proceeding)
(refusing to provide mandamus relief to protect privacy rights in tax returns
when the rights had already been forfeited by production of the documents). 
Thus, the fact that El Naggar did not file the second assignment until after
the petition was filed does not preclude our consideration.[1]

Lastly, regarding the third argument,
appellant cites no authority suggesting that a party cannot assign its
privileges.  Instead, appellant analogizes to cases holding that a legal
malpractice claim cannot be assigned.  See, e.g., Vinson & Elkins v.
Moran, 946 S.W.2d 381, 392-93 (Tex. App.CHouston [14th Dist.] 1997, no writ); Zuniga
v. Groce, Locke & Hebdon, 878 S.W.2d 313, 318 (Tex. App.CSan Antonio 1994, writ ref=d).  The basis for these opinions
lies in the special nature of the attorney-client relationship.   See, e.g.,
Moran, 946 S.W.2d at 393-94.  Gainsco suggests that this same reasoning
also prevents a client from assigning attorney-client and work product
privileges.








However, as illustrated by the
present circumstances, assignment of evidentiary privileges is fundamentally
different from assignment of a legal malpractice claim.  By assigning Traxel=s privileges in the documents held by
Gainsco, Bell effectively waived the right to assert the privileges.  In other
words, Traxel (through Bell) has foregone its right to assert the benefits of
the attorney-client relationship with Fahl.  Conversely, in the malpractice
context, the assignor of the claim assigns the right to assert the benefits of
the relationship.  Whether the assignment of privileges is viewed more as a
waiver in itself or as a transfer of the right to waive the privileges, the
result is the same:  Traxel may no longer assert the privileges.  Consequently,
Gainsco no longer has grounds on which to assert privileges on Traxel=s behalf.[2] 
A client unquestionably has the right to waive the attorney-client privilege.  Tex. R. Evid. 511.  Furthermore, Rule
511 contemplates the possibility that privileges can pass from one person or
entity to another.  Id. (referring to the Apredecessor . . . holder of the
privilege@).  Accordingly, we find Gainsco=s arguments regarding validity of the
assignment, and hence its assertion of Traxel=s privileges, to be without merit.

B.  Assertion of Gainsco=s Privileges








In its AResponse to Real Parties in Interest=s Motion to Lift Stay,@ Gainsco suggests that even if Traxel=s assignment is valid, such
assignment would not prevent Gainsco from asserting its own privileges in the
claims file documents.  While this is certainly true of the coverage suit
documents discussed below, Gainsco suggests that it is also true for some of
the underlying case documents.  Gainsco=s respective positions are
incompatible in their inconsistencies.  In its petition, Gainsco clearly and
repeatedly asserted that all of the documents identified as pertaining to the
underlying litigation were protected from disclosure only because Gainsco was
operating as Traxel=s representative in the underlying litigation.[3] 
In its response to the motion to lift stay, however, Gainsco suggests that it
may separately assert its own privileges to protect the same documents.  The
difficulty is that in the privilege log and the petition, Gainsco has refuted
any right to assert its own privileges in the underlying case documents; yet,
in the response to the motion, it makes a global assertion that it may have
privileges in the same documents.[4]  Regardless,
it offers little in the way of argument or explanation regarding its right to
assert privileges relative to  these documents (claiming, in part, that the
documents  per se demonstrate the applicability of the privileges).

Because protection of attorney-client
and work product privileges is an important concern, we have conducted our own
document-by-document review.  See generally Duncan v. Bd. of Disciplinary
Appeals, 898 S.W.2d 759, 762 (Tex. 1995) (AOur rules recognize that our system
of justice relies on a client=s privilege to speak frankly and candidly with his or her
attorney.@) (citing Fisher v. United States, 425 U.S. 391, 403 (1976)).  The
underlying case documents can be further grouped into the following
categories:  (1) communications involving Fahl, the attorney representing
Traxel in the underlying litigation; (2) communications involving only Cooper,
the attorney representing Gainsco, and Gainsco itself; and (3) computer
database notes made by Gainsco employees relating either to Traxel=s defense in the underlying case or
to coverage issues.

 








1.  Communications With Fahl

Regarding the first subcategory,
documents drafted by or addressed to Fahl, Gainsco acknowledges that it cannot
assert its own privileges in regards to certain of these documents because Fahl
represented Traxel and not Gainsco.  Although Gainsco appears to generally
assert its own privileges in other Fahl-related documents, it offers no
authority or reasoning to support this contention. Gainsco has not established
the existence of an attorney-client relationship with Fahl (indeed, it has
steadfastly denied it).  Accordingly, Gainsco cannot assert attorney-client
privilege in its communications with Fahl, and it cannot assert attorney work
product in regards to documents prepared by Fahl.  See Tex. R. Civ. P. 192.5; Tex. R. Evid. 503(b)(1).

2.  Communications with Cooper

Regarding the second subcategoryCcommunications involving only Cooper
and GainscoCthese documents are covered by Gainsco=s attorney-client privilege.  All of
the documents falling in this category are invoices for legal services from
Cooper to Gainsco  (including Bates Nos. G01386-88, 1389-91, 1392-93, 1394-96,
1428-37, 1441-44, and 1658-62).

3.  Database Notes








In the third and final subcategory,
Gainsco asserts privileges regarding entries in a database of file notes.[5] 
These notes are uniformly terse statements of events (court filings, receipt of
documents, communications, settings, etc.) regarding the lawsuit filed by El
Naggar against Traxel.  In reviewing many of these notes, it is not clear
whether they pertain only to Traxel=s defense in the underlying
litigation or whether they also involve coverage issues.  Additionally, in some
of the notes, it is unclear whether the attorney being referenced was Fahl or
Cooper.  Gainsco offers no explanation or evidence to clarify these
ambiguities, merely arguing instead that the documents themselves reveal their
privileged nature.  The party asserting a privilege has the burden of
demonstrating application of the privilege.  See Tex. R. Civ. P. 193.3(a), (b); In re Living Ctrs. of Tex.,
Inc., 175 S.W.3d 253, 261 (Tex. 2005); see also Marathon Oil Co. v. Moye,
893 S.W.2d 585, 591 (Tex. App.CDallas 1994, orig. proceeding) (holding that party asserting
privilege met burden by providing affidavits and a detailed privilege log).  In
its privilege log, Gainsco identified all of the notes as relating to the
underlying litigation.  Furthermore, in its petition, Gainsco steadfastly
asserted that all of the documents identified as pertaining to the underlying
litigation were protected from disclosure only because Gainsco was operating as
Traxel=s representative in the underlying
litigation.  Accordingly, where Gainsco has offered no new explanation for the
asserted privileges, we will default to its original explanation (i.e.,
that the only privilege asserted are Traxel=s) unless the substance of the
individual note clearly demonstrates otherwise.

More specifically, many of the
entries appear to reference communications with Fahl.  Because Fahl represented
Traxel and not Gainsco, it appears that any privilege attached to these entries
would exist based only on Gainsco=s professed capacity as
representative of Traxel.  Thus, Traxel=s assignment of its privileges
effectively waived any privileges attached to these documents.  Gainsco can
therefore assert no independent privilege in regards to these notes.

Only a handful of notes facially
reflect that they were generated from conversations with Cooper or clearly
relate to coverage issues as opposed to underlying case issues (including: (1)
note dated December 7, 2004 at Bates No. G01060; (2) note dated October 5,
2004, 9:05 a.m., at Bates No. G01061; (3) note dated October 4, 2004, 10:56 a.m.,
at Bates No. G01062; and (4) note dated September 24, 2003 at Bates No.
G01066).  These notes are covered by Gainsco=s attorney-client privilege.  Gainsco
has not sufficiently demonstrated that any other notes are covered by any
privilege.

 








C.  Reliance on Attorney=s Privileges

Next, Gainsco suggests that even if
Traxel=s assignment of privileges is valid,
any waiver of privileges by Traxel would not prevent Glen Fahl from asserting
his core work product privilege to prevent production of the documents in
Gainsco=s possession.[6] 
However, while Gainsco has included an affidavit from Fahl in the record, Fahl
makes no assertion of any privilege in the affidavit.  Instead, Fahl states
that Athis affidavit is offered as a
perfunctory matter to substantiate the Gainsco=s [sic] claim of privilege.@  He then goes on to specify that the
documents in Gainsco=s possession are privileged because he reported to and
communicated with Gainsco Ain furtherance of Traxel=s defense in the Lawsuit.@  Fahl himself has asserted no
individual right or desire to prevent disclosure of the documents even though
given the opportunity to do so.  Further, in his affidavit, Fahl does not
refute the fact that Traxel has waived (or at least assigned) the very
privileges of which he is writing in support.  Accordingly, we find Gainsco=s argument that it is entitled to
protect Fahl=s privileges to be without support in the record and thus without merit.

D.  Relevancy Objection








Lastly, Gainsco contends that the
trial court erred in refusing to sustain its relevancy objection to the request
for the claims file.  Gainsco relies on Maryland American General Insurance
Co. v. Blackmon, 639 S.W.2d 455 (Tex. 1982), for the proposition that an
insurer=s claims file documents are not
relevant until the insurer=s liability, for coverage or for breach of contract, has been
established.  However, Gainsco misreads the Blackmon holding in two key
respects.  First, the Blackmon court did not hold that the file in
question was irrelevant; rather, it held that the file was protected from
production by the attorney-client and work product privileges.  639 S.W.2d at
458.  Indeed, the court stated:  AWe will assume for purposes of this
opinion that the information ordered to be disclosed is relevant.@  Id. at 457.[7] 
Second, the file at issue in Blackmon was not an underlying claims file,
such as that identified by Gainsco in the present case, but an investigative
file that contained materials pertaining to the insurer=s decision to not pay a claim.  Id.
at 457.[8]  The insurer
in Blackmon was not attempting to assert the insured=s privileges to prevent disclosure of
the file, as Gainsco does here.  Accordingly, the lessons of Blackmon
are inapposite to the present case, and we cannot say that the trial court
abused its discretion in refusing to sustain Gainsco=s relevancy objection to the requests
for production.

Gainsco has represented that it could
not produce the documents identified as underlying case documents because to do
so would violate Traxel=s privileges barring such disclosure.  We disagree.  Except
for the few documents we have identified as clearly covered by Gainsco=s own privileges, the assignment by
Traxel effectively waived claims of privilege for all of the underlying
litigation documents.

IV.  Documents Pertaining to the
Current Coverage Suit








The second category of documents
regarding which Gainsco has asserted privileges pertains to the current
coverage suit.  In its privilege log, Gainsco lists eighteen current-suit
claims-file documents as responsive to the requests for production.  Of these
eighteen documents, Gainsco asserts privileges to only ten.  Of these ten,
three were drafted after the trial court=s cut-off date in the order
compelling production; thus, Gainsco was not ordered to produce them.[9] 
Of the remaining seven documents, five are transmittal cover letters or
facsimile cover sheets.  There is nothing clearly confidential in nature about
the contents of any of these five documents.  Cf. Valero Transmission, L.P.
v. Dowd, 960 S.W.2d 642, 645 (Tex. 1997) (holding that cover letter from
lawyer to client transmitting draft of agreement was privileged because it gave
specific legal advice concerning the draft).  At most, each simply identifies
the document being transmitted and asks the recipient to review it.  The Ato@ and Afrom@ information on the cover sheets was
also included in Gainsco=s privilege log, of which El Naggar received a copy, and the
referenced documents were all produced.  Accordingly, we cannot say that the
trial court clearly abused its discretion in ordering production of these five
documents.

The remaining two documents include
(1) the request from Preen (Gainsco=s designated claims adjuster for El
Naggar=s claims) to Cooper (Gainsco=s coverage attorney) for a coverage
opinion regarding the underlying litigation and (2) Cooper=s responsive coverage opinion
(respectively, Bates Nos. G01068-69 and G00979-996).  Both of these documents
clearly contain confidential communication made for the purpose of facilitating
the rendition of professional legal services to Gainsco.  See Tex. R. Evid. 503(b)(1).[10] 
Thus, these documents are covered by the attorney-client privilege.

V.  Crime/Fraud Exception








El Naggar contends, however, that
Gainsco cannot assert the attorney-client privilege with regard to any of the
underlying case documents or the coverage case documents because the
crime/fraud exception applies.[11]  Under this
exception, the attorney-client privilege cannot be enforced when Athe services of the lawyer were
sought or obtained to enable or aid anyone to commit what the client knew or
reasonably should have known to be a crime or fraud.@  Tex.
R. Evid. 503 (d)(1).  Once the party resisting discovery establishes
that documents are protected by the attorney-client privilege, the party
seeking the documents may establish that the crime-fraud exception applies to
defeat the privilege.  See Freeman v. Bianchi, 820 S.W.2d 853, 861 (Tex.
App.CHouston [1st Dist.] 1991, orig.
proceeding), mand. denied sub nom, Granada Corp. v. Honorable First
Court of Appeals, 844 S.W.2d 223 (1992).  The exception applies only when
(1) a prima facie case is made of contemplated fraud, and (2) there is a
relationship between the document at issue and the prima facie proof offered.  Granada
Corp., 844 S.W.2d at 227.  A prima facie showing is sufficient if it sets
forth evidence that, if believed by a trier of fact, would establish the elements
of a fraud or crime that Awas ongoing or about to be committed when the document was
prepared.@  Coats v. Ruiz,  198 S.W.3d 863, 876 (Tex. App.CDallas 2006, no pet.); Freeman,
820 S.W.2d at 861.  A court may look to the document itself to determine
whether a prima facie case has been established.  Cigna Corp. v. Spears,
838 S.W.2d 561, 569 (Tex. App.CSan Antonio 1992, orig. proceeding); Freeman, 820
S.W.2d at 862.

Here, El Naggar has alleged that
Gainsco committed a Afraudulent transfer@ by entering into the buyback
agreement with Traxel.  AFraudulent transfer,@ as will be discussed below, is a
statutory term of art that does not necessarily equate to the term Afraud@ as used in the crime/fraud
exception.  See Tex. Bus. &
Com. Code Ann. '' 24.001-.013 (Vernon 2002 & Supp. 2006) (the Texas
Uniform Fraudulent Transfer Act); Tex.
R. Evid. 503 (d)(1).  El Naggar offers no analysis regarding whether the
crime/fraud exception applies in the fraudulent transfer context.  Although it
may in fact apply under certain circumstances, we conclude that it does not
apply here, based on El Naggar=s allegations in the present lawsuit.








We begin our analysis by examining
the scope of the fraud portion of the crime/fraud exception.  The Texas Rules
of Evidence do not define what is intended in Rule 503(d)(1) by the phrase Ato commit . . . [a] fraud.@  Black=s Law Dictionary defines fraud as: AA knowing misrepresentation of the
truth or concealment of a material fact to induce another to act to his or her
detriment.@  Black=s Law Dictionary 670 (7th Ed. 1999).  The Texas common law tort of
fraud also requires proof of misrepresentation, concealment, or
non-disclosure.  See Custom Leasing, Inc. v. Tex. Bank & Trust Co. of
Dallas, 516 S.W.2d 138, 142-43 (Tex. 1974); Daugherty v. Jacobs, 187
S.W.3d 607, 617-18, 620 (Tex. App.CHouston [14th Dist.] 2006, no pet.). 
The legal concept of fraud therefore has at its core a misrepresentation or
concealment.  This definition also dovetails with the apparent reasoning behind
inclusion of fraud in the exception: by keeping client communications
confidentialCpursuant to the attorney-client privilegeCthe attorney whose client intends to
make a misrepresentation or concealment helps prevent the injured party from
learning the truth about the misrepresentation or concealment.  Thus, in that
situation, the attorney=s silence affirmatively aids the client in committing the
tort.  This is not generally true of other torts (not based on
misrepresentation or concealment) and explains why the exception is not the
crime/tort exception.

In Volcanic Gardens Management Co.
v. Paxson, the El Paso Court of Appeals similarly concluded that 

under the crime/fraud exception to
the lawyer‑client privilege, Afraud@ would include the commission and/or
attempted commission of fraud on the court or on a third person, as well as
common law fraud and criminal fraud.  The crime/fraud exception comes into play
when a prospective client seeks the assistance of an attorney in order to make a
false statement or statements of material fact or law to a third person or
the court for personal advantage.

847 S.W.2d 343, 348 (Tex. App.CEl Paso 1993, orig. proceeding)
(emphasis added).  The court explained that it was taking a broad view of what
constituted a fraud for application of the exception, explaining that other
courts had restricted its meaning to include only actionable common law fraud. 
Id. at 347 (discussing Freeman, 820 S.W.2d 853, and Spears,
838 S.W.2d 561).  Thus, it is clear that for the fraud portion of the
crime/fraud exception to apply, there must be at least a prima facie showing
that a misrepresentation or concealment was ongoing or about to be committed
when the document in question was prepared.








El Naggar alleges fraudulent transfer
as the basis for application of the crime/fraud exception in the present case. 
Fraudulent transfer is a statutory cause of action that permits a creditor to
recover assets transferred by a debtor under certain circumstances.  Tex. Bus. & Com. Code Ann. '' 24.005, .008, .009.  Although
concealment of the transfer is one factor that may be considered in determining
whether a transaction is deemed fraudulent under the statute, it is not a
required element of the cause of action.  Id. ' 24.005(a), (b).  Thus, an allegation
and prima facie case of fraudulent transfer does not mandate application of the
crime/fraud exception unless it includes an allegation and prima facie case of
concealment.








In its petition, El Naggar alleged
Gainsco and Traxel entered into the buyback agreement Ato avoid, frustrate, hinder, delay
and defraud@ El Naggar from collecting on the insurance policy and thereby committed
a fraudulent transfer.[12]  As proof of
the fraudulent transfer, El Naggar points to the facts that (1) the buyback was
negotiated in secret, (2) it contained a confidentiality term, and (3) it
contained an agreement to make a representation that there was no insurance for
Traxel in the underlying case.  Although each of these statements appears to be
true, at least as far as it goes, under the circumstances of this case (as
acknowledged by El Naggar), none amounts to a prima facie case of concealment
or misrepresentation.  While the typewritten language in the buyback agreement
contains a confidentiality term, handwritten and initialed language on the same
page of the agreement permitted Traxel to apprize El Naggar of the buyback.  A
short time after entering the agreement, Traxel informed El Naggar of the
buyback.  Thus, although the original typewritten language suggests that at one
point there was an intention to conceal, there was no effective concealment
(and no indication that a misrepresentation was ever made).  According to El
Naggar=s pleadings and all the relevant
evidence in the record, the buyback agreement was entered into shortly before
the second trial in the underlying case, and El Naggar was also informed of the
agreement shortly before the trial.  Indeed, El Naggar received a relatively
large verdict and judgment at the conclusion of the second trial and then
attempted to have the judge in that case throw out the buyback agreement. 
While there may have been a brief period between signing the agreement and
disclosure to El Naggar, there is no evidence of an attempt to conceal
execution of the agreement from El Naggar.  To the contrary, by its own terms,
the agreement permitted disclosure to El Naggar, and Traxel informed El Naggar
of the agreement shortly after it was signed.  Accordingly, El Naggar has
failed to present a prima facie case that the crime/fraud exception should
apply to defeat Gainsco=s assertions of attorney-client privilege.[13]

VI.  Redaction of Reserves
Information

Gainsco additionally contends that
the trial court abused its discretion in refusing to permit redaction of
reserves information from documents Gainsco is otherwise required to produce. 
In its privilege log, Gainsco identified certain documents containing notations
of reserves for either the underlying litigation or the current litigation. 
Gainsco asserts that this information should be redacted because it is not
relevant to any issues in the case, would not be admissible at trial, and would
not lead to the discovery of admissible evidence, citing In re American Home
Assurance Company, 88 S.W.3d 370, 377 (Tex. App.CTexarkana 2002, orig. proceeding).








Gainsco does not, however, address
the question of whether this issue is a proper subject for mandamus.  As
discussed above, mandamus is an appropriate remedy only when (1) the trial
court has clearly abused its discretion, and (2) no adequate remedy by appeal
exists.  In re Daisy Mfg. Co., 17 S.W.3d at 658.  Gainsco makes no
argument regarding whether there is an adequate remedy by appeal on this
issue.  In Walker v. Packer, the court explained that a party may not
have an adequate remedy by appeal Awhere a discovery order compels the
production of patently irrelevant . . . documents, such that it clearly
constitutes harassment or imposes a burden on the producing party far out of
proportion to any benefit that may obtain to the requesting party.@  827 S.W.2d at 839.  Gainsco makes
no argument based on harassment or burden.  Indeed, it would actually be more
burdensome here to redact the information from the documents to be produced.[14]

In In re American Home, the
case cited by Gainsco, the court did conditionally grant mandamus on the trial
court=s order requiring reserves
information to be produced.  88 S.W.3d at 377.  However, the circumstances were
very different in that case.  To begin with, the court was considering whether
the trial court=s entire order to compel was too broad in scope and thus too
burdensome.  Id. at 372.[15]  The
reserves information was just one portion of the order.  Further, the order
required Adocumentation and deposition information regarding the setting of
reserves for third-party claims against the plaintiffs.@  Id. at 377.  Although it is
not entirely clear exactly what would have been required to satisfy the order,
it reads considerably more broadly and appears to be more burdensome than the
trial court=s order before us.  Accordingly, we decline to issue mandamus to require
redaction of the reserves information.[16]








VII.  Conclusion

We hold that the trial court abused
its discretion by compelling production of certain of the underlying case
documents (including the documents at Bates Nos. G01386-88, 1389-91, 1392-93,
1394-96, 1428-37, 1441-44, and 1658-62, and the database notes dated:  December
7, 2004 at Bates No. G01060; October 5, 2004, 9:05 a.m., at Bates No. G01061;
October 4, 2004, 10:56 a.m., at Bates No. G01062; and September 24, 2003 at
Bates No. G01066) as well as the coverage opinion request and the coverage
opinion (respectively, Bates Nos. G01068-69 and G00979-996).  We further hold
that Gainsco does not have an adequate remedy by appeal in regards to
production of these documents.  See Walker, 827 S.W.2d at 839.  We find
no other error in the trial court=s order compelling production. 
Accordingly, we grant relief in part and conditionally grant the petition for
writ of mandamus.  The writ will issue only if the trial court fails to act in
accordance with this opinion.

 

 

 

 

/s/        Adele Hedges

Chief Justice

 

 

Petition
for Writ of Mandamus Conditionally Granted in Part and Denied in Part and
Opinion filed May 15, 2007.

 

Panel consists of Chief Justice
Hedges and Justices Yates and Seymore.









[1]  Furthermore, both El Naggar and Fred Bell indicated
that they thought the first assignment was sufficient to transfer the right to
waive the privileges in question.  Thus, the second assignment is more in the
way of a clarification than a completely new agreement.





[2]  Arguably, if under different circumstances El Naggar
was attempting to enforce rather than waive the privileges it received from
Traxel, the analysis could be different.  However, El Naggar is clearly
asserting waiver, and Traxel has disassociated itself with any right to assert
the privileges.  Thus, as stated, Gainsco is left without any basis on which to
assert privileges on Traxel=s behalf.





[3]  Gainsco specifically represented that:

 

Gainsco=s actions in engaging defense counsel and monitoring
the defense of the underlying suit were to facilitate Traxel=s defense in the suit and to further Fahl=s rendition of professional legal services to Traxel.
. . . [T]he withheld documents themselves relating to the underlying suit
established the applicability of the work product privilege because they
revealed (a) material prepared or mental impressions developed in anticipation
and furtherance of Traxel=s defense at trial, by a party (Traxel) or a party=s representatives (Traxel=s attorney, Fahl, and Traxel=s insurer, Gainsco); and (b) communications made in
anticipation and furtherance of Traxel=s
defense at trial . . . .  Again, as to the underlying suit, the attorney-client
and work product privileges belonged to Traxel, not Gainsco. . . .  As stated,
as to the underlying suit, the >person upon
whom these rules confer a privilege against disclosure= is Traxel.





[4]  Although we will address Gainsco=s motion argument, it is important to note that this
new argument is not simply an alternative to the previous argument, it is a
completely contrary argument.  The factual premise of Gainsco=s petition argumentCthat
the underlying litigation documents are privileged solely based on Traxel=s attorney-client and work product privilegesChas not been disproved or refuted.  El Naggar, in
fact, basically agrees that the privileges attached to these documents are
Traxel=s.  In its fallback argument, Gainsco asserts that it
could protect the documents even from Traxel.

As will be discussed, many of the
designated underlying case documents were drafted by, addressed to, or
pertaining to communications with Fahl, the attorney representing Traxel in the
underlying litigation; thus, the attorney-client privilege regarding these
documents could only belong to Traxel and not Gainsco.  See Tex. R. Evid. 503(b)(1).  Furthermore,
in order for a person or entity to assert the work product privilege, the
material in question must have been created in anticipation of litigation.  See
Tex. R. Civ. P. 192.5.  Gainsco
was not a party to the underlying litigation and does not suggest that it
anticipated becoming a party.  While Gainsco claims that it anticipated
becoming a party to future coverage litigation, it has made this representation
specifically only regarding documents related to the coverage suit.





[5]  This database, part of a document management system
known as AImageRight,@
allowed Gainsco employees to input file notes automatically organized by date
and time.  A printout of the notes was included with the in camera documents,
and the individual notes were listed on the privilege log.  Gainsco employees
apparently did not keep separate sets of notes for issues related to Traxel=s defense and issues related to coverage.





[6]  In support of its argument, Gainsco relies upon a
case construing the federal counterpart to the Texas work product privilege.  See
In re Grand Jury Proceedings, 43 F.3d 966, 972 (5th Cir. 1994).





[7]  The core holding of Blackmon is that a
plaintiff/insured cannot defeat the attorney-client and work product privileges
of an insurer simply by alleging bad faith; however, the privileges may
be defeated once liability is established.  639 S.W.2d at 458.





[8]  As discussed above, to the extent Gainsco is
contending that documents in the claims file relate to its decision to not pay
El Naggar=s claim, it has identified these documents as
pertaining to the coverage suit not the underlying litigation.  These documents
are discussed below.





[9]  The trial court ordered Gainsco to produce documents
created before February 5, 2005, which was the date on which El Naggar filed
the current lawsuit.





[10]  As claims adjuster for the El Naggar claims, Preen
was clearly a representative of the client in regards to these documents under
the meaning of Rule 503.  Tex. R. Evid. 503(a)(2)
(AA representative of the client is one having authority
to obtain professional legal services, or to act on advice rendered pursuant
thereto, on behalf of the client.@).





[11]  El Naggar also argues generally that an insurer=s claims file in relation to a lawsuit against an
insured is not protected from discovery in subsequent litigation against the
insurer, citing Turbodyne Corp. v. Heard, 720 S.W.2d 802, 803 (Tex.
1987); Allen v. Humphreys, 559 S.W.2d 798, 803 (Tex. 1977); Victoria
Lloyds Insurance Co. v. Gayle, 717 S.W.2d 166, 168 (Tex. App.CHouston [1st Dist.] 1986, orig. proceeding); and Service
Lloyds Insurance Co. v. Clark, 714 S.W.2d 437, 439 (Tex. App.CAustin 1986, orig. proceeding).  However, each of
these cited cases involved assertions of the party communications privilege
contained in former Rule 166b(3)(d) of the Texas Rules of Civil Procedure.  Tex. R. Civ. P. 166b(3)(d) (repealed
1998) (see now Tex. R. Civ. P. 192.5(a)(2)). 
These cases have no impact on Gainsco=s
assertion of attorney-client privilege.  Unlike the old and the new rules
governing party communications, the attorney-client privilege is not limited in
its application to communications made in anticipation of litigation.  Compare
Tex. R. Civ. P. 192.5(a)(2) and
Turbodyne, 720 S.W.2d at 803-04 (discussing former rule 166b(3)(d)), with
Tex. R. Evid. 503.





[12]  In granting a partial summary judgment favoring El
Naggar, the trial court has declared the Gainsco-Traxel buyback agreement to be
void, apparently as against public policy.  However, because (1) this order was
not made an object of Gainsco=s petition for
writ of mandamus and (2) we need not answer the question in order to decide the
issues before us, we take no position on whether such an agreement violates
public policy in Texas.





[13]  The Volcanic Gardens court held that the
crime/fraud exception could apply to any false statement regardless of whether
it constituted actionable fraud.  847 S.W.2d at 348.  While we agree with the
court=s conclusion that there must be a misrepresentation or
concealment before the fraud portion of the crime/fraud exception can apply, we
need offer no opinion regarding whether the exception can apply absent a prima
facie showing of an actionable claim for fraud.  Because we hold that El Naggar
has failed to present a prima facie case that any misrepresentation or
concealment occurred, we do not reach the question of whether an actionable
fraud occurred.

Furthermore, we note that the crime/fraud
exception would also not apply to the request for the coverage opinion and the
coverage opinion itself because no relationship has been established between
those documents and the alleged fraud.  Granada Corp., 844 S.W.2d at
227.  The request for the coverage opinion was dated September 3, 2003, and the
coverage opinion was dated September 16, 2003.  Other than the fact that they
discuss the possibility of coverage in the underlying litigation, neither
document references anything pertaining to the buyback agreement.  The evidence
establishes that it was Traxel that first approached Gainsco about entering
into a buyback agreement (possibly through Fahl), and the agreement itself was
not signed until October 6, 2004, more than a year after the request and the
coverage opinion were exchanged.  El Naggar points to nothing in the record
establishing a nexus between these documents and the allegedly fraudulent
buyback agreement.





[14]  Gainsco does make the general point that requiring
insurers to disclose reserves information could result in inflated reserves
and, in turn, interfere with state insurance departments= duty of protecting consumers.  However, we are not
requiring Gainsco to produce anything in this proceeding, we are simply
considering whether mandamus should issue against the trial court=s order.  Thus, Gainsco=s concern that a rule requiring disclosure of reserves information
would have widespread impact is not implicated here.





[15]  The court cited K Mart Corp. v. Sanderson,
937 S.W.2d 429, 431-32 (Tex. 1996), for the proposition that a party ordered to
produce overly-broad discovery Awell outside
the bounds of proper discovery@ has no
adequate remedy by appeal.  In re Am. Home, 88 S.W.2d at 372.





[16]  Interestingly, El Naggar does not address the
reserves issue on appeal and appears to have not done so in the trial court. 
Furthermore, the trial court=s orders do not
specifically mention Gainsco=s request to
redact reserves.  It is unclear whether the court ever explicitly considered
the matter.

Because of our resolution of these
discovery issues in this original proceeding, we take no position regarding
whether the reserves information would be admissible if offered at trial. 
However, we note that the question of whether reserves information is relevant
in coverage or bad faith cases may be a far more complex issue than Gainsco
suggests.  See generally State of West Virginia ex rel. Erie Prop. &
Cas. Ins. Co. v. Mazzone, 625 S.E.2d 355, 358-60 (W. Va. 2005) (discussing
cases from various jurisdictions); id. at 360-67 (Davis, J., concurring)
(same).